Steven AYALA, Petitioner–Appellant,

v.

Hubert SPECKARD, Superintendent of Groveland Correctional Facility, Respondent–Appellee.

No. 1304, Docket 95–2463.

United States Court of Appeals, Second Circuit.

Argued May 9, 1996.

Decided July 15, 1996.

Karl E. Pflanz, Office of the Appellate Defender, New York City (E. Joshua Rosenkranz, Joseph M. Nursey, Diane E. Courselle, on the brief), for petitioner-appellant.

Jennifer A. Daskevich, Assistant District Attorney, New York City (Robert T. Johnson, District Attorney, Joseph N. Ferdenzi, Nancy D. Killian, Assistant District Attorneys, on the brief), for respondent-appellee.

Before: CARDAMONE, ALTIMARI and PARKER, Circuit Judges.

ALTIMARI, Circuit Judge:

Petitioner-appellant Steven Ayala ("Ayala") was arrested as a result of an undercover "buy and bust" operation by state police officers in the Bronx, New York. At trial, the state prosecutor sought to have the courtroom closed during the police officer's testimony so as not to jeopardize the safety and efficacy of the officer's future undercover operations. The state court judge granted the closure and allowed the officer to testify absent the scrutiny of the public. Ayala unsuccessfully appealed his conviction through the state system, asserting that the courtroom closure violated his Sixth Amendment right to a public trial. Thereafter, Ayala sought a writ of habeas corpus in the United States District Court for the Southern District of New York (Keenan, *J.*). The district court found Ayala's contentions unavailing and denied the writ. Ayala now argues, *inter alia,* that the district court erred in denying the writ of habeas corpus because the State failed to advance an interest that was likely to be prejudiced by the undercover officer's open testimony. Because we agree that there was no "substantial probability" that an overriding state interest would have been prejudiced by the public testimony of the undercover officer, we reverse the judgment of the district court and remand for issuance of the writ.

## BACKGROUND

In his first two years of undercover work, Detective Willie Dotson ("Dotson") made approximately two hundred purchases of illicit drugs. During that period of time, Dotson and a team of officers engaged in what are known as "buy and busts"—Dotson, undercover, would purchase drugs with premarked bills, identify the individual from whom he had bought the drugs to his team members, and those officers in his team would then arrest the offending individual.

One such "buy and bust" arrest took place on September 22, 1990, moments after Ayala allegedly sold Dotson ten dollars worth of crack cocaine. Ayala was tried before a jury some ten months later in the New York Supreme Court of Bronx County (Marcus, *J.*), and was convicted of criminal sale of a controlled substance in the third degree, *see* N.Y. Penal Law § 220.16[1] (McKinney Supp.1996), and criminal possession of a controlled substance in the fifth degree, *see* N.Y. Penal Law § 220.06[5] (McKinney Supp. 1996). As a second time felony offender, Ayala was sentenced to six-and-a-half to thirteen years in prison.

The principal witness against Ayala at trial was Dotson. Prior to Dotson's testimony, the State moved to close the courtroom to protect the officer's identity and well-being. Accordingly, the trial judge held a hearing to determine the propriety of closing the courtroom. In the hearing, after stating that he was an undercover officer with the 41st Precinct, Dotson testified as follows:

Q: And are you going to be working there after you testify here today or tomorrow, are you going to be going back to the 41st Precinct?

A: Yes, Ma'am.

Q: And do you have any idea about how long you're going to be in that area?

A: Maybe six months, it depends.

Q: Okay. And, Detective Dotson, could you please tell the Court what, if any, apprehensions you have about going to that area should you be recognized by people in an open courtroom?

A: Yes. I—if I go back to this particular area and I know I will be because I was there previously and I am recognized, I fear for my life and my safety and that of my fellow police officers due to the fact that if I am recognized.

There have been occasions where I would just say that people are injured or killed if they're recognized and if they know that you are a police officer, it has happened on occasion.

Q: Detective Dotson, have you ever personally been approached by citizens of Bronx County or ex-defendants on the street who have attempted in some way to indicate to other people that you are a police officer?

A: Yes.

On cross-examination, Dotson further testified:

Q: Detective, you testified to a general fear for you safety, is that correct; if someone were to recognize you from the courtroom, is that correct?

A: A general fear?

Q: Yes.

A: I fear for my safety.

Q: Okay. Was there anything specifically about this case, has anyone ever approached you with respect to this case if you were to testify, if you're going to testify that would cause you to have some sort of apprehension or fear for your safety? . . . .

A: At this point, no, sir.

Q: And isn't it a fact that you testify with respect to closing the courtroom in every particular case that you do?

A: Yes, sir.

Based upon Dotson's testimony, and over the objections of Ayala's attorney, the trial judge excluded all spectators from the courtroom during Dotson's testimony.

On direct appeal, Ayala argued that the New York Supreme Court had violated his constitutional right to a public trial and that the State had failed to proffer a sufficient "overriding interest" to justify the courtroom closure. The Appellate Division rejected Ayala's Sixth Amendment challenge, stating that:

[t]he People provided ample justification for the closure of the courtroom during the undercover officer's testimony. The undercover officer testified that he had been working in the specific area where the crime took place for the past month; that he expected to go back there within a day after his trial testimony; that he had purchased drugs in the same building where this crime occurred just one week earlier; that he purchased drugs from the immediate area of this building about 20 times in the past year; that he "[d]efinitely" expected to go back to that area to buy drugs; that he had previously been approached by ex-defendants on the street who had attempted to warn others that he was a police officer; and that he feared for his life and safety as well as the lives and safety of his fellow officers should he be recognized.

*People v. Ayala*, 202 A.D.2d 262, 608 N.Y.S.2d 642, 643 (1st Dep't 1994). Thereafter, the New York Court of Appeals denied Ayala leave to seek review of the Appellate Division's decision. *See People v. Ayala*, 83 N.Y.2d 908, 614 N.Y.S.2d 390, 637 N.E.2d 281 (1994).

On October 31, 1994, Ayala brought the present habeas corpus petition in the United States District Court for the Southern District of New York. In his petition, Ayala contended that the State had violated his Sixth Amendment rights by failing to meet all four prongs of the *Waller* test: 1) the State did not advance an overriding interest that was likely to be prejudiced by Dotson's open testimony; 2) the closure was broader than necessary to protect the State's interest; 3) the court failed to consider reasonable alternatives to closing the courtroom; and 4) the court failed to make adequate findings in support of the closure. *See Waller v. Georgia*, 467 U.S. 39, 48, 104 S.Ct. 2210, 2216–17, 81 L.Ed.2d 31 (1984). The State conceded that habeas review was appropriate as to the

first prong of the *Waller* test, but argued that because Ayala had not specifically disputed the other three prongs in state court that he could not do so now in his habeas petition.

The district court rejected the State's exhaustion argument but found Ayala's constitutional claim to be without merit. By opinion dated June 21, 1995, the district court held that: 1) the State had amply demonstrated likely prejudice of its overriding interest in protecting an undercover officer's anonymity and safety; 2) because Ayala had not requested that any family members be present during Dotson's testimony, the temporary courtroom closure for Dotson's testimony was no broader than necessary; 3) the trial court was under no obligation to *sua sponte* consider alternatives to complete closure of the courtroom and therefore did not err in considering no other alternatives; and 4) the state court justified its closure with sufficient specificity on the record. Accordingly, the district court rejected Ayala's petition. Moreover, the district court denied Ayala's motion for a certificate of probable cause to appeal. On October 31, 1995, this Court granted Ayala's motion for a certificate of probable cause and allowed the present appeal to go forward.

On appeal, Ayala contends, as he has below, that his Sixth Amendment right to a public trial was violated by the closure of the courtroom during his state trial.

## DISCUSSION

### 1. *Exhaustion*

As an initial matter, we address the State's proposition that Ayala may not appeal three of the four prongs of the *Waller* test for failure to exhaust state remedies.

■ In the interest of comity and in keeping with the requirements of 28 U.S.C. § 2254(b) (1994), federal courts will not consider a constitutional challenge that has not first been "fairly presented" to the state courts. *See Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (en banc). It is clear, however, that Ayala's Sixth Amendment challenge was

"fairly presented" on direct appeal through the New York system. Not only did Ayala expressly invoke the Sixth Amendment in his arguments before the Appellate Division, *see Daye*, 696 F.2d at 192 ("Obviously if the petitioner has cited the state courts to the specific provision of the Constitution relied on in his habeas petition, he will have fairly presented his legal basis to the state courts."), he also pointed to the very case under which he now challenges the constitutionality of the courtroom closure, namely *Waller*. Despite the State's protestations, Ayala need not have raised the exact constitutional *arguments* in state court before challenging the constitutionality of the exact same acts under the same constitutional provision in federal court on habeas review. *See id.* at 192 n. 4.

### 2. *Courtroom Closure*

■ While not absolute, the Sixth Amendment's guarantee of a "public trial" carries with it a presumption that judicial proceedings will be open to the public. *See Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*"); *Guzman v. Scully*, 80 F.3d 772, 774–75 (2d Cir.1996) (quoting *Waller*, 467 U.S. at 45, 104 S.Ct. at 2214–15). The right to a public trial is an important one, for, as the Supreme Court has stated, only with openness may " 'the public ... see [that the accused] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions ....' " *Gannett Co. v. DePasquale*, 443 U.S. 368, 380, 99 S.Ct. 2898, 2906, 61 L.Ed.2d 608 (1979) (quoting *In re Oliver*, 333 U.S. 257, 270 n. 25, 68 S.Ct. 499, 506 n. 25, 92 L.Ed. 682 (1948)). Moreover, the presence of the public has the additional salutary effect of discouraging perjury. *See Waller*, 467 U.S. at 46, 104 S.Ct. at 2215.

■ In light of the importance of the Sixth Amendment right to a public trial, the Supreme Court has held that a courtroom may only be closed to the public if:

[1] the party seeking to close the hearing ... advance[s] an overriding interest that is likely to be prejudiced,

[2] the closure [is] no broader than necessary to protect that interest,

[3] the trial court [has] consider[ed] reasonable alternatives to closing the proceeding, and

[4] [the trial court makes] findings adequate to support the closure.

*Id.* at 48, 104 S.Ct. at 2216 (formatting added). On appeal, Ayala contends that the district court erred with respect to each prong of the *Waller* test. Because we find that the State failed to advance an overriding interest that was likely to be prejudiced, we reverse the district court's denial of Ayala's petition for a writ of habeas corpus.

### A. *Overriding Interest*

 The first prong of the *Waller* test requires that before a courtroom be closed to the public, the party seeking the closure must present evidence of an "overriding interest that is likely to be prejudiced." *Id.* Such a closure may not, however, be predicated upon the mere possibility that an interest will be prejudiced, *see United States v. Doe,* 63 F.3d 121, 130 (2d Cir.1995); rather, the Supreme Court has made clear that there must be a "substantial probability" that the interest in question will be prejudiced by open testimony, *see Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 14, 106 S.Ct. 2735, 2743, 92 L.Ed.2d 1 (1986) ("Press–Enterprise II"). Moreover, the burden is upon the party seeking closure to establish the existence of a substantial probability of prejudice. *See Doe,* 63 F.3d at 130.

 It is clear from the hearing testimony quoted above that the State failed to establish the existence of a substantial probability that an overriding interest would likely have been prejudiced by Dotson's testimony in open court. While it is undisputed that the State has an overriding interest in protecting the safety, as well as the confidentiality, of its undercover officers, *see United States ex rel. Lloyd v. Vincent,* 520 F.2d 1272, 1274–75 (2d Cir.), *cert. denied,* 423 U.S. 937, 96 S.Ct. 296, 46 L.Ed.2d 269 (1975), nothing in the record below evinces a substantial probability

that testifying in Ayala's trial would have endangered Dotson's safety or blown his cover. The district court below properly determined that the *possibility* of injury existed as a result of Dotson's returning to the field after testifying openly. The mere possibility of prejudice, however, even when such important interests are at stake, is not tantamount to a substantial probability of likely prejudice and cannot justify abridging Ayala's constitutional protections in the case at hand.

Fatal to the State's assertion of likely prejudice is its failure to establish the nexus between Dotson's testimony and the ultimate compromise of Dotson's safety and cover. Although Dotson testified that he was fearful for his safety should he be required to testify in open court, he did not state any particularized fear resulting from testifying in Ayala's trial. In fact, Dotson explicitly stated that there was nothing special about the trial that made him fearful. Nor did he suggest that anyone in a position to blow his cover was likely to be in the courtroom when he testified. Rather, Dotson expressly stated that he sought courtroom closure as a matter of course whenever he testified. As a result, the State failed to establish a substantial probability that anyone observing Dotson's testimony in open court would threaten his safety or cover should he return to the field in general or even the exact location at which Ayala was arrested. *See, e.g., Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir.1994) (discussing exclusion of defendant's parents from courtroom for fear they would disclose undercover officer's identity in retribution for son's conviction), *cert. denied,* —— U.S. ——, 115 S.Ct. 778, 130 L.Ed.2d 672 (1995); *Woods v. Kuhlmann,* 977 F.2d 74, 77 (2d Cir.1992) (discussing propriety of excluding entire family when single family member had threatened witness because remaining family members "could 'tell the other[s]' of the substance of [witness's] testimony"). The state may not subjugate Ayala's constitutional protections to the mere possibility that someone with the ability and inclination to injure Dotson will be present in the courtroom during his brief testimony. *Cf. Lloyd,* 520 F.2d at 1275 n. 1 (presence of other targets in nar-

cotics investigation in courtroom only an "added factor," not determinative, in justifying closure). Accordingly, the district court erred in determining that the State had established a substantial probability that Dotson's safety or cover would likely be prejudiced by his testimony in open court.

To hold otherwise would establish a rule that, despite the Sixth Amendment, no undercover officer who intends to return to undercover work need testify in open court. We cannot tolerate such a rule in light of the Supreme Court's mandate that closure be justified by a "substantial probability" of prejudice. While prior to the establishment of the "substantial probability" test in *Waller* this Court stated that "shielding the identity of a[n undercover] police witness, preserving his future usefulness, and safeguarding his life provides an adequate justification for excluding the public," *Lloyd*, 520 F.2d at 1274–75, we do not believe that such a broad holding is justified any longer in light of *Waller*. As the *Lloyd* Court itself admitted, the mere fact that one is an undercover officer testifying in open court creates only a "risk of exposure," but not a substantial probability of exposure. *See id.* at 1275. Judges must consider courtroom closure on a case by case basis, allowing the public to be excluded only if the moving party establishes a "substantial probability" of prejudice. The State failed to make such a showing in the case at hand.

We do not mean to suggest that Dotson's safety and anonymity are not extremely important State interests worthy of protection. The work of Detective Dotson and his colleagues is an invaluable component of law enforcement. Nor do we mean to suggest that the State could not have demonstrated a substantial probability that Dotson's safety and anonymity would likely be prejudiced by his open testimony. As this Court recently made clear, a trial court may reasonably *infer* a substantial probability from those facts put forward by the party seeking courtroom closure. *See Doe*, 63 F.3d at 130. "Indeed, in some circumstances it might be within a [trial] court's discretion to grant closure without evidence of a direct threat or other evidence corroborating a defendant's

subjective fears," *id.*, for example in those cases involving criminal organizations in which a judge may reasonably infer the courtroom presence of interested parties with a motivation to retaliate against the witness, *see id.*, *United States v. Scarpelli*, 713 F.Supp. 1144, 1145–46 n. 2 (N.D.Ill.1989) (noting possibility of "Godfather-style retribution"). Had Dotson suggested that Ayala's associates or other residents of the neighborhoods in which Dotson performed undercover work were likely to be present in the courtroom during his testimony, we would have no difficulty inferring a substantial probability of likely prejudice. Dotson's barren testimony in the case at hand, however, does not provide the basis for even an inference of likely prejudice.

### B. *Reasonable Alternatives*

Although we need not address the third prong of the *Waller* test in light of the resolution above, it is clear that the state court did not consider reasonable alternatives to complete closure of the courtroom during Dotson's testimony. For example, Dotson could easily have testified behind a screen, thus allowing the public at large to attend the trial without exposing Dotson's identity. *See Vidal*, 31 F.3d at 69.

More importantly, the district court in its opinion below asserted that the state court was under no obligation to "*sua sponte* invent alternatives," particularly when the petitioner never proposed any such alternatives himself. We cannot agree with this proposition. As we have repeatedly stated, "the trial court *must consider* reasonable alternatives to closing the proceeding" as a predicate to closing the courtroom. *Guzman*, 80 F.3d at 775 (emphasis added); *Vidal*, 31 F.3d at 69 (emphasis added); *Woods*, 977 F.2d at 76 (emphasis added). Therefore, prior to abridging a defendant's Sixth Amendment rights, trial courts are under an absolute duty to consider possible alternatives to complete courtroom closure. *See Press–Enterprise II*, 478 U.S. at 14, 106 S.Ct. at 2743; *Doe*, 63 F.3d at 131.

Our holding is unaffected by the recent amendments to the Habeas Corpus statutes which became law on April 24, 1996, with the

enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214. Assuming, without deciding, that these provisions apply retroactively to cases pending when the law was passed, the new standard for issuance of the writ does not dictate a different outcome. The new statute provides that the writ will not issue unless the petitioner establishes that the state court decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." *Id.*, § 104 (amending 28 U.S.C. § 2254(d)). Here, *Waller* provides the clearly established federal law to which the state court decision was contrary.

## CONCLUSION

For the reasons stated above, we reverse the judgment of the district court and remand for the issuance of a writ of habeas corpus.