**Steven AYALA, Petitioner–Appellant,**

**v.**

**Hubert SPECKARD, Superintendent of Groveland Correctional Facility, Respondent–Appellee.**

**No. 1304, Docket 95–2463.**

United States Court of Appeals, Second Circuit.

Petition for Rehearing Submitted July 29, 1996.

Decided Dec. 11, 1996.

**650**

Karl E. Pflanz, Richard M. Greenberg, Office of Appellate Defender, New York City, for Steven Ayala.

Billie J. Manning, Howard B. Sterinbach, Joseph N. Ferdenzi, Jennifer A. Daskevich, Dist. Atty's Office, Bronx, NY, for Hubert Speckard.

Before: CARDAMONE, ALTIMARI and PARKER, Circuit Judges.

PER CURIAM.

## I. BACKGROUND

In our initial opinion in this case, 89 F.3d 91 (with which we assume familiarity), we reversed the district court's denial of Ayala's petition for a writ of habeas corpus and remanded for issuance of the writ. We reasoned that under the standards established in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*"), and *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) ("*Press–Enterprise II*"), Ayala was deprived of his Sixth Amendment "right to a ... public trial" (made applicable to the states by the Fourteenth Amendment, *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507–08, 92 L.Ed. 682 (1948)) when the state trial court closed the courtroom for the testimony of Detective Dotson, the undercover police officer to whom Ayala sold crack cocaine.

The State has petitioned us to rehear the case. The New York State District Attorneys Association has filed an amicus brief also urging us to rethink our initial opinion. Both the State and the District Attorneys argue that our initial opinion improperly created and applied retroactively a new rule of constitutional criminal procedure in violation of *Penry v. Lynaugh*, 492 U.S. 302, 313–14, 109 S.Ct. 2934, 2943–44, 106 L.Ed.2d 256 (1989) (adopting the plurality's opinion in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)). We ordered responsive briefing from Ayala's counsel, the Office of the Appellate Defender, addressing whether our opinion improperly applied a new rule of constitutional law.

Having considered the arguments contained in these briefs, we grant the petition for rehearing and address herein the issues. As explained further below, we remain convinced that our initial opinion was correctly decided.

## II. DISCUSSION

There are two sources of the presumption that criminal court proceedings are open to the public. The First Amendment implicitly vests the public with a right of access to the courthouse, *see Press–Enterprise II*, 478 U.S. at 7, 106 S.Ct. at 2739–40, and the Sixth Amendment explicitly guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... public trial." U.S. Const. amend. VI. The Sixth Amendment's public trial guarantee is at least as strong as the First Amendment's. *Waller*, 467 U.S. at 46, 104 S.Ct. at 2215 ("there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public."). Furthermore, whether the right stems from the First or Sixth Amendment, the "public-trial guarantee [is] for the benefit of the defendant." *Id.* Lastly, while some State interests may justify courtroom closure, "[s]uch circumstances will be rare, however, and the balance of interests must be struck with special care."[1] *Id.* at 45, 104 S.Ct. at 2215.

---

1. The Supreme Court's observation that courtrooms should be closed to the public only rarely

■ As we explained in our initial opinion, there are four things that must occur before a courtroom can be closed without violating the Sixth Amendment:

(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,

(2) the closure must be no broader than necessary to protect that interest,

(3) the trial court must consider reasonable alternatives to closing the proceeding, and

(4) it must make findings adequate to support the closure.

*Waller,* 467 U.S. at 48, 104 S.Ct. at 2216 (numbering added) (applying the First Amendment standard enunciated in *Press–Enterprise I* to the Sixth Amendment context). In our initial opinion, we held Ayala's courtroom closure to be unconstitutional for two alternative reasons. First, we concluded the prosecution failed to satisfy the first *Waller* element (showing sufficient probability of prejudice to a sufficiently serious interest). Second, we ruled that the state court's failure to consider alternatives to closure of the proceedings violated the third *Waller* element. As indicated above, the State now argues that both rationales contravene the nonretroactivity rule of *Teague.*

A. *The State's failure to argue that petitioner sought a new rule of constitutional criminal procedure waives that argument.*

■ The State concedes that it has not argued until now that a ruling favorable to Ayala would create a new and impermissible rule of constitutional criminal procedure. This failure is significant in light of the fact that our initial opinion did not diverge from positions urged by Ayala. *Compare* 89 F.3d at 95 ("[t]he state may not subjugate Ayala's constitutional protections to the mere possi-

bility that someone with the ability and inclination to injure Dotson will be present in the courtroom during his brief testimony.") *with* Appellant's Brief at 13 (arguing that "it is not enough for the movant to establish a theoretical possibility of harm; even a 'reasonable likelihood of substantial prejudice' is not sufficient.") (citing *Press–Enterprise II,* 478 U.S. at 14, 106 S.Ct. at 2743); *compare also* 89 F.3d at 96 (disagreeing with district court's ruling that trial judges are not obligated to consider alternatives to closure *sua sponte* ) *with* Appellant's Brief at 25 ("*Waller* does not place the onus of suggesting alternatives upon the defendant. Instead, 'the trial court must consider reasonable alternatives to closing the proceeding.'") (citing *Waller* 467 U.S. at 48, 104 S.Ct. at 2216) (emphasis added by appellant). Thus, the State knew the position urged by Ayala. The State argued that Ayala's interpretation was incorrect. But the State never argued that if we agreed with Ayala, we would be contravening the rule of *Teague.*[2]

The Supreme Court has said

A threshold question in every habeas case, therefore, is whether the court is obligated to apply the *Teague* rule to defendant's claim. We have recognized that the nonretroactivity principle is not 'jurisdictional' in the sense that federal courts must raise and decide the issue *sua sponte.* Thus, a federal court may, but need not, decline to apply *Teague* if the State does not argue it.

*Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) (citations, quotation marks, emphasis, and ellipsis omitted). As discussed below, we conclude that our initial opinion broke no new constitutional ground. But the State concedes, as it must, that it has never raised the *Teague* issue until now. The *Teague* question is thus waived. *Ciak v. United States,* 59 F.3d 296, 302 (2d Cir.1995).

casts an interesting light on what appears to be a relatively common practice in New York courts. The District Attorneys tell us that they have located at least ninety "otherwise final" state court decisions in which courtrooms have been closed. Ayala's counsel suggests the majority of these closures occurred in "buy and bust" cases such as this one.

**2.** The difference between arguing that a certain interpretation of a Supreme Court opinion is incorrect and arguing that that interpretation would be new may not be obvious. The former involves analysis of the Supreme Court's words. The latter involves analysis of the Supreme Court's words *and* whether the interpretation which that analysis produces reflects a new principle.

B. *Even if the Government did not waive the* Teague *argument, the initial opinion does not break new constitutional ground.*

"A case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Caspari v. Bohlen,* 510 U.S. 383, 390, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994) (brackets omitted) (citing *Teague* ). The reason for this rule is bottomed on the purpose of federal collateral review: "to create an incentive for state courts to conduct their proceedings in a manner consistent with established constitutional standards." *Wright v. West,* 505 U.S. 277, 311, 112 S.Ct. 2482, 2500, 120 L.Ed.2d 225 (1992) (Souter, J., concurring) (citations and internal quotation marks omitted). Everyone agrees in this action that *Waller* and both *Press–Enterprise* cases were "existing precedent" during the relevant state court proceedings. As discussed below, we see the original opinion in this case as a straightforward application of the constitutional standards enunciated in those cases.

### 1. *Substantial Probability of Prejudice to an Overriding Interest.*

In our initial opinion, we restated the rule that before a request to close a courtroom can overcome the constitutional presumption of a public trial, the party seeking to close the courtroom must show a "substantial probability" that an "overriding interest" will be prejudiced. 89 F.3d at 95. Applying that rule to the case before us, we recognized that the safety of law enforcement personnel constitutes an "overriding interest." *Id.* We ruled, however, that the state failed to show a "substantial probability" that Detective Dotson's safety would be prejudiced by testifying in open court. *Id.* It bears emphasizing that we in no way directed that undercover agents identify themselves in each and every trial; we merely directed that the trial court find after sufficient argument or hearing that there was a "substantial probability" that by testifying in open court the undercover agent's safety would be endangered, or that such a substantial probability reasonably can be inferred from facts put forward by the state. *Id.* at 96.

The State continues to argue that Detective Dotson's safety would have been exposed to a substantial probability of prejudice if the courtroom had not been closed. While we continue to disagree with the State's argument, the District Attorneys in their amicus brief proffer another interest which they claim is overriding and was subject to an undue probability of prejudice—the interest in maintaining the effectiveness of a law enforcement agent acting in an undercover capacity.

As indicated in our original opinion, the work of undercover law enforcement personnel is often invaluable and thanklessly dangerous. Accordingly, we agree that the government's interest in managing the risk to its undercover agents is "overriding." Assuming *arguendo* that the government's interest in minimizing the risk of compromising the effectiveness of Detective Dotson as an undercover agent is different from its interest in ensuring his safety, our original opinion did not address whether the State had established a substantial probability of prejudice to its interest in minimizing that risk had Dotson been required to testify in open court.

In any event, as discussed below, we continue to hold that the court's failure to consider alternatives to closure violated the commands of the Supreme Court—assuming *arguendo* that the State has not waived its *Teague* argument. Therefore, we do not now address whether in the circumstances of this case Detective Dotson's open court testimony would have presented a substantial probability of prejudice to the State's interest in minimizing the risk to Detective Dotson.

### 2. *Consideration of Alternatives.*

■ The State also argues that our alternative rationale for reversing the district court's denial of the writ (i.e., that the court failed to consider less drastic alternatives to full closure during Detective Dotson's testimony) constituted an inappropriate expansion of *Waller.* Specifically, the State argues that the Sixth Amendment does not burden

the court to consider alternatives to complete closure unless the party objecting to closure suggests reasonable alternatives. We reject the State's argument, which has been adopted by the New York Court of Appeals, *see People v. Martinez,* 82 N.Y.2d 436, 444, 604 N.Y.S.2d 932, 624 N.E.2d 1027 (1993), for at least five reasons.

First, in *Waller* the Supreme Court, after reciting the four things that *must* occur prior to courtroom closure, addressed the trial court's failure to consider reasonable alternatives. "The court did not consider alternatives to immediate closure of the entire hearing: directing the government to provide more detail about its need for closure, *in camera* if necessary, and closing only those parts of the hearing that jeopardized the interests advanced." 467 U.S. at 48–49, 104 S.Ct. at 2217–17. The words following the colon in the just-quoted sentence can only be read as examples of "consider[ing] reasonable alternatives." But nothing in *Waller* suggests that the party opposing courtroom closure—in that case the defendant—made any such suggestion, other than a general objection.[3]

Second, we emphasized above and reemphasize here that the Sixth Amendment guarantee to a public trial is at least as strong as the First Amendment guarantee. In *Press–Enterprise II,* a First Amendment case, the Supreme Court reversed a courtroom closure in part because the lower court "failed to consider whether alternatives short of complete closure would have protected the interests of the" party seeking to close the proceedings. 478 U.S. at 14, 106 S.Ct. at 2743. Significantly, in that case the courtroom was closed pursuant to an unopposed motion. 478 U.S. at 4, 106 S.Ct. at 2738. No one suggested any alternatives because the State and the accused agreed that they wanted the proceeding closed. Nonetheless, the Supreme Court reversed. Because the First Amendment requires consideration of less restrictive alternatives even absent a suggestion of such alternatives, and because the Sixth Amendment is at least as protective of the public trial as the First Amendment, the Sixth Amendment also does not require the party seeking to keep the courtroom open to suggest alternatives to full closure.

Third, *Waller* makes clear that courtroom closure must be no broader than necessary. 467 U.S. at 48, 104 S.Ct. at 2216–17. Implicit in that command is the requirement to consider measures less broad than complete closure. It would be odd indeed to require an accused who is insisting upon his right to a public trial to also propose alternatives to a completely public trial in order to preserve any objection to its closure.

Fourth, there are numerous obvious alternatives that were never considered. For example, a strategically placed chalkboard may have allowed the public into the courtroom without seeing the identity of the undercover officer. Another approach might have been to ask Ayala who he wanted in the courtroom, then cause the State to show why any such person should not be present. *See, e.g., Vidal v. Williams,* 31 F.3d 67, 69 (2d Cir. 1994). Still another approach could have been for Detective Dotson to have concealed his identity in some other manner, such as disguise. From our appellate perspective we cannot say whether any of these less broad alternatives were feasible. But there was zero consideration given to them. We also recognize that these alternatives may indeed be cumbersome. But the Supreme Court in *Press–Enterprise II* specifically relied on the

---

**3.** The State cites a concurring opinion of Justice Powell in *Gannett Co. v. DePasquale,* 443 U.S. 368, 401, 99 S.Ct. 2898, 2916–17, 61 L.Ed.2d 608 (1979) for the proposition that at least one Supreme Court Justice held the view that those who object to closure have the responsibility of showing that alternatives to closure are available. It should be pointed out that the *Waller* decision, which was also authored by Justice Powell for the Court, was decided after *Gannett* and is controlling. It could well be that Justice Powell altered his view in the interim. Moreover, *Gannett* was a case where the defendants sought closure in order to preserve their Eighth Amendment right to a fair trial in light of extensive pre-trial publicity. Justice Powell suggested that once the defendant showed that fairness would likely be prejudiced, if the press objected to closure, it should propose alternatives. *Waller* and this case, on the other hand, involved the defendant's right to a public trial which is guaranteed by the Sixth Amendment. Nothing in Justice Powell's *Gannett* concurrence suggests the defendant must make a showing of alternatives to protect that right.

existence of less drastic, albeit "cumbersome," alternatives which the lower court had not considered. 478 U.S. at 15, 106 S.Ct. at 2743–44.

Fifth, and perhaps most importantly, the Supreme Court has unmistakably held that courtrooms are presumed to be open. *Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824. For that presumption to mean anything, the party seeking to close the court must have the burden of insuring that the court adequately addresses constitutional concerns. If those concerns are not properly addressed it is appropriate for the party seeking to deviate from the constitutional norm, here the State, to bear the risk of reversal on appeal. If the party seeking to close the courtroom does not assist the court in considering alternatives, then, as we stated before, the court must *sua sponte* consider such alternatives.

### III. CONCLUSION

Efficient law enforcement and the right to a public trial may at times be incompatible. The guarantees found in the Bill of Rights carry societal costs. The costs of the public trial right are most dramatic where, as here, the trial court did not take proper steps at the time the courtroom was closed. But having failed to have considered, and adopted if feasible, less drastic alternatives, the courtroom closure in this case violated the Constitution. We are aware of the scourge of illegal drugs in our society, and the importance of governmental efforts to fight their proliferation. But those efforts do not independently justify improper courtroom closure.

Consistent with our original opinion, we reverse the district court's denial of Ayala's petition for a writ of habeas corpus. Ayala is to be released from custody if he is not retried within a reasonable time. The mandate is to issue forthwith.