OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 Typically, in "buy-and-bust” cases, an undercover officer purchases a small quantity of narcotics from the defendant and a second officer thereafter makes the arrest. Where the People show that open-court testimony by the undercover officer during defendant’s trial would jeopardize the undercover’s safety and effectiveness, is it proper for the Trial Judge to close the courtroom during the testimony of that witness?
 

 While we have already answered that question in the affirmative in
 
 People v Martinez
 
 (82 NY2d 436), these appeals present two related questions. First, were the factual showings of potential harm to active undercover witnesses sufficient? Second, assuming sufficient factual showings were made, did the trial courts err in failing to consider, on their own and on the record, possible alternatives that were less restrictive than courtroom closure during the witnesses’ testimony? Concluding that both record and constitutional requirements were satisfied here, we affirm the Appellate Division orders upholding the convictions.
 

 Facts
 

 People v Ramos
 

 Defendant was charged with criminal sale of a controlled substance in the third degree for allegedly selling two vials of "crack” cocaine to undercover officers number 27296 and
 
 *495
 
 number 569 on August 18, 1993. The "buy” took place on the corner of Wyckoff Avenue and Palmetto Street in Brooklyn. The court held a pretrial
 
 Hinton
 
 hearing (31 NY2d 71,
 
 cert denied
 
 410 US 911) to determine the People’s motion to close the courtroom during the testimony of the undercover officers.
 

 Officer number 27296 testified that he was actively engaged in undercover work in the 104th police precinct in Queens County, which included the Brooklyn site of defendant’s arrest. He had worked in this location several times during the past month and expected to return there that day or the next. The officer had, in the past, seen former "buy” subjects outside and around the courthouse, and he had several cases pending in the court, including some in the very same courtroom. He testified that he feared for his safety should his identity as a police officer be revealed and that he took certain measures to protect his anonymity, including riding to court in an unmarked car and using a private entrance to the courthouse. While making undercover buys in the past, the officer further testified, he had been recognized and his safety compromised. No one connected with the defendant or any pending cases, however, had threatened him.
 

 Officer number 569 also worked undercover in the 104th precinct. He had operated there the preceding week and planned to return that evening or the next day. He had, at times, observed individuals from whom he had purchased drugs in an undercover capacity on Queens Boulevard and, like number 27296, had seen the targets of prior undercover investigations in and around the courthouse. Number 569 had approximately a dozen cases pending in the court, and he utilized the same measures specified by number 27296 to conceal his identity upon entering the courthouse. He, too, feared that he would be in danger if his true identity were discovered. Number 569 specifically testified that he had been threatened at gunpoint when a former subject discovered that he was a police officer.
 

 The trial court noted that the facts concerning the two officers were very similar — the officers worked in the same area of Queens, had open cases pending in the court and had seen "buy” subjects in the proximity of the courthouse. Citing
 
 People v Martinez
 
 (82 NY2d 436,
 
 supra),
 
 however, the court refused to order closure based on those facts alone.
 

 Instead, with regard to number 27296, the trial court ordered partial closure, allowing any individuals connected with the
 
 *496
 
 cases on the court’s calendar to be present unless the prosecutor could establish that those cases involved this undercover officer. Any strangers unconnected with court business were excluded, and a guard was stationed at the door to enforce this order. The court further suggested that the officer could wear dark glasses or don any other disguise. Defense counsel, however, immediately protested that he wished to be notified in advance if the officer intended to conceal his identity.
 

 The trial court found closure warranted during the testimony of undercover number 569. According to the court, the distinguishing factor was that number 569 had in fact been threatened by a former subject. The transcript of both officers’ testimony remained available to the public.
 

 The remaining witnesses, which included a detective, a New York City employee and a police chemist, testified in open court. Defendant was convicted of the sale charge, and the Appellate Division affirmed.
 

 People v Ayala
 

 On September 23, 1993, defendant was arrested as part of a buy-and-büst operation for selling a $10 bag of heroin to an undercover officer at Clinton and East Houston Streets in Manhattan. He was charged with criminal sale of a controlled substance in the third degree. The People sought to close the courtroom during the officer’s testimony.
 

 The undercover officer testified at the
 
 Hinton
 
 hearing that he had been working in the Manhattan South Narcotics and Guns Unit for the past 21 months. He was currently active in the 5th, 7th and 9th precincts, where he had operated in the past two weeks and expected to return the following week. The 5th precinct included the courthouse and the 9th encompassed the site of defendant’s buy and bust. The officer had 15 to 20 ongoing investigations in these three precincts.
 

 The officer claimed that it would jeopardize his safety and impede his effectiveness should his name or identity be made public. Although he had previously been threatened in front of the courthouse by a defendant in an unrelated case, he had not received any threats from anyone connected to this case.
 

 The trial court ordered the courtroom closed during the witness’ testimony, pointing out that he was presently active in the same location where the arrest occurred and had 15-20 active cases in that area. In reaching this conclusion, the court noted that the officer had entered the courtroom through the Judge’s private entrance. Defense counsel never suggested any
 
 *497
 
 alternatives to closing the courtroom, nor did the court expressly consider any. As in
 
 Ramos,
 
 the People did not seek to suppress the minutes of the officer’s testimony.
 

 The courtroom remained open during the testimony of the remaining prosecution witnesses — three police officers and a police chemist. Defendant was convicted, and the Appellate Division affirmed.
 

 Discussion
 

 A criminal defendant’s right to a public trial (US Const 6th Amend; Civil Rights Law § 12; Judiciary Law § 4), though fundamental, is not absolute. Rather, trial courts possess "inherent discretionary power” to exclude members of the public from the courtroom
 
 (People v Hinton,
 
 31 NY2d at 73-74, 75,
 
 supra; see, People v Martinez, 82
 
 NY2d at 441,
 
 supra).
 
 There remains, however, a presumption of openness. Consequently, the right to an open trial may yield to other rights or interests in rare circumstances only, and "the balance of interests must be struck with special care”
 
 (Waller v Georgia,
 
 467 US 39, 45;
 
 see also, People v Martinez, supra,
 
 at 441;
 
 People v Hinton, supra,
 
 at 75-76).
 

 In
 
 Waller v Georgia
 
 (467 US at 48), involving a suppression hearing in a gambling case, the United States Supreme Court held that closure must meet a four-part standard to comport with the requirements of the Sixth Amendment:
 

 "[T]he party seeking to close the [proceeding] must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.”
 

 Defendants here urge that the People failed to establish a sufficient likelihood of prejudice to an overriding interest to warrant closing the courtroom during the testimony of the undercover officers. Even if this initial requirement were satisfied, the parties raise the additional question whether the trial courts adequately fulfilled their duty under
 
 Waller
 
 to consider alternatives to excluding the public. We consider each contention in turn.
 

 Likelihood of Prejudice to an Overriding Interest
 

 The essential first step is a sufficient trial record to establish a substantial probability of prejudice to an overriding interest
 
 *498
 
 in the event of open-court testimony. Clearly in buy-and-bust cases that requires more than conclusory assertions that the officer remains an active undercover and fears for his or her safety.
 

 Analysis begins with our decision in
 
 People v Martinez
 
 (82 NY2d 436,
 
 supra),
 
 where we addressed the requisite factual showing to satisfy the first "prong” of
 
 Waller
 
 in the context of undercover testimony in buy-and-bust cases. We refused in
 
 Martinez
 
 to sanction a rule of per se closure for all active undercover officer witnesses, reiterating that " 'unparticularized impressions of the vicissitudes of undercover narcotics work in general’ ” did not suffice to overcome the presumptive right to an open trial
 
 (id.,
 
 at 443;
 
 see also, People v Jones,
 
 47 NY2d 409, 415,
 
 cert denied
 
 444 US 946). Nor did an officer’s ongoing undercover operations in a borough of New York City — without greater specificity — satisfy the
 
 Waller
 
 standard
 
 (People v Martinez,
 
 82 NY2d at 443).
 

 Protecting the safety of law enforcement officers, as a general matter, unquestionably constitutes a compelling interest. What we recognized in
 
 Martinez
 
 was that the mere possibility that this safety interest might be compromised by open-court testimony does not justify abridgement of a defendant’s constitutional right to a public trial. The Supreme Court has made clear that the proponent of closure must establish a "substantial probability” that the articulated interest will be prejudiced by an open courtroom
 
 (see, Press-Enterprise Co. v Superior Ct.,
 
 478 US 1, 14). Thus, a specific link must be made between the officer’s safety concerns and open-court testimony in the particular buy-and-bust case
 
 (see, People v Martinez,
 
 82 NY2d at 443,
 
 supra).
 
 The nexus might be established, for example, by references to "associates of defendant or targets of investigation likely to be present in the courtroom, or to threats received”
 
 (id.).
 

 We therefore .held that the People’s "perfunctory showing” in
 
 Martinez
 
 that the officer continued to operate undercover "in the Bronx area” failed to establish a sufficient likelihood of harm to satisfy the first prong of
 
 Waller.
 
 By contrast, the People’s showing was adequate in
 
 People v Pearson,
 
 the companion case to
 
 Martinez.
 
 There, where the officer testified that she continued to function daily at the location of defendant’s arrest, which was readily accessible from the courthouse, the trial court’s conclusion that open-court testimony would endanger the witness’ safety was not an abuse of discretion
 
 (id., habeas corpus denied sub nom. Pearson v
 
 
 *499
 

 James,
 
 No. 94 Civ 1499 [SD NY, Oct. 20, 1995],
 
 revd
 
 105 F3d 828, 830 [2d Cir 1997] [but concluding that the officer’s "testimony that her undercover activity was continuing in the same neighborhood where she purchased cocaine from the defendant sufficed to indicate the State’s strong interest in concealing her identity”],
 
 reh en banc granted
 
 No. 95-2801 [2d Cir May 19, 1997]).
 

 Applying these principles to the two cases now before us, the facts were sufficient to establish a substantial probability that the People’s interests — protecting the undercover officers’ safety and effectiveness — would be prejudiced by their testimony in open court. In
 
 Ramos,
 
 both officers had observed former "buy” subjects in and around the courthouse and had several other cases pending before the court. Indeed, officer number 27296 had cases pending in the very same courtroom
 
 (cf., People v Hinton,
 
 31 NY2d 71,
 
 supra
 
 [targets of undercover officer’s other investigations were present in the courtroom]). Thus, in notable contrast to
 
 Martinez (see,
 
 82 NY2d at 443,
 
 supra),
 
 the undercover officers specifically referred to the likelihood of encountering other investigative targets.
 

 Both officers, moreover, had recently worked undercover in the same precinct where defendant was arrested and expected to . resume undercover operations there within a day. Finally, their efforts to conceal their identities upon entering the courthouse bolstered the claims that they feared being recognized as police officers
 
 (compare, People v Cordero,
 
 150 AD2d 258,
 
 affd
 
 75 NY2d 757 [closure improper, where undercover officer waited openly in common area of court’s drug part]). Given all of this testimony, the trial court did not abuse its discretion by concluding that an overriding interest would likely be prejudiced by open-court testimony.
 
 [1]
 

 The factual showing in
 
 Ayala,
 
 however, presents a closer question. There, the undercover officer simply identified certain precincts in which he was recently active and expected to return imminently. These included the precinct where he purchased drugs from the defendant and the precinct within which the courthouse was located. The officer was thus unable
 
 *500
 
 to pinpoint his continued area of operations as particularly as the officer in
 
 Pearson,
 
 who had identified a specific Manhattan corner.
 

 Nevertheless, the officer’s designation of certain police precincts was narrower than the geographically vague reference to "the Bronx area” deemed insufficient in
 
 Martinez.
 
 Police officers cannot be expected always to have advance notice of the precise street corner to which they will be assigned, and here the officer’s specification of certain precincts was akin to identifying the particular neighborhoods in which he continued to be active. Since these included both the neighborhood of defendant’s drug activity and the neighborhood of the courthouse, a sufficient link was made between testifying openly in defendant’s case and being recognized by residents of those neighborhoods in which the officer worked undercover. That the officer used a private entrance to the courtroom further confirmed his claim that he feared being identified. On balance, then, the trial court did not abuse its discretion in concluding that open-court testimony would likely compromise the officer’s safety and effectiveness.
 

 Having concluded that Waller’s first prong was satisfied, we turn to the obligation of trial courts to consider alternatives to excluding the public during the testimony of undercover officers.
 

 Alternatives to Closure
 

 Waller
 
 requires the trial court to "consider reasonable alternatives to closing the proceeding.” The United States Court of Appeals for the Second Circuit has concluded that this imposes an affirmative duty on trial courts to raise alternatives
 
 sua sponte
 
 and place their consideration of them on the record
 
 (see, Ayala v Speckard,
 
 89 F3d 91,
 
 adhered to on reh
 
 102 F3d 649,
 
 cert denied —
 
 US —, 117 S Ct 1838 [May 19, 1997],
 
 reh en banc granted
 
 No. 95-2463 [2d Cir May 19, 1997]).
 
 [2]
 
 Because this conflicts with our conclusion in
 
 Pearson
 
 (82 NY2d at 443-444,
 
 supra),
 
 decided more than two years before
 
 Ayala,
 
 we reexamine the relevant precedent.
 

 
 *501
 

 Waller
 
 derived from the standards articulated 13 years ago by the Supreme Court in
 
 Press-Enterprise Co. v Superior Ct. of Cal.
 
 (464 US 501 [1984])
 
 (Press-Enterprise I)
 
 for closing courtrooms under the First Amendment of the United States Constitution.
 
 [3]
 
 In
 
 Press-Enterprise I,
 
 the court in a rape trial denied the media’s request to open the voir dire to the press and public, closing all but three days of the six-week proceeding. The State, in opposing access, argued that closure was necessary to protect sensitive information related by prospective jurors and encourage candor. The court also refused to release the transcript, even though most of the recorded questioning was "of little moment”
 
 (see, id.,
 
 at 503-504). On review, the Supreme Court set forth the following guidelines:
 

 "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered”
 
 (id.,
 
 at 510).
 

 The Court further explained that "[a]bsent consideration of alternatives to closure, the trial court could not constitutionally close the
 
 voir
 
 dire”
 
 (id.,
 
 at 511). Specifically,.the trial court could have "minimize[d] the risk of unnecessary closure” by keeping the proceedings open but allowing jurors to request in camera questioning for sensitive subject matter
 
 (id.,
 
 at 512-513). Likewise, before suppressing the entire transcript, the court could have "consider[ed] whether [it] could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved”
 
 (id.,
 
 at 513). Under these circumstances, closure violated the First Amendment.
 

 Four months after
 
 Press-Enterprise I,
 
 the Supreme Court concluded in
 
 Waller
 
 that "the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public” (467 US at 46,
 
 supra).
 
 It thus held that the
 
 Press-Enterprise I
 
 rules applied to closure under the Sixth Amendment, articulating the oft-cited four-part test for closure
 
 (id.,
 
 at 47-48).
 

 
 *502
 
 Applying that test, the Court deemed the closure in
 
 Waller
 
 improper. The People had sought to exclude the public from the defendant’s hearing on his motion to suppress wiretaps and other seized evidence, because the wiretap information would become inadmissible under State statute if published. The Supreme Court explained that the trial court’s findings did not justify its decision to close all seven days of the hearing, when the wiretap tapes lasted only two and one-half hours. In particular, "[t]he court did not consider alternatives to immediate closure of the entire hearing” such as "directing the government to provide more detail about its need for closure * * * and
 
 closing only those parts of the hearing that jeopardized the interests
 
 advanced”
 
 (id.,
 
 at 48-49 [emphasis added]).
 

 Just two years later, in
 
 Press-Enterprise Co. v Superior Ct.
 
 (478 US 1 [1986],
 
 supra) (Press-Enterprise II),
 
 the Supreme Court again addressed the reasonable alternatives requirement in the First Amendment context. In a highly publicized murder prosecution, the Magistrate granted the defendant’s unopposed motion to close the preliminary hearing in order to protect his interest in a fair trial; it then refused to release the transcript of the 41-day proceeding. The Supreme Court found this denial of access improper, pointing out that "[i]f the interest asserted is the right of the accused to a fair trial, the preliminary hearing shall be closed only if specific findings are made demonstrating that * * * reasonable alternatives to closure cannot adequately protect the defendant’s fair trial rights”
 
 (id.,
 
 at 14).
 

 Relying on these precedents, the Second Circuit recently held in
 
 Ayala v Speckard
 
 (89 F3d 91,
 
 supra)
 
 that it is error for trial courts to close their courtrooms during testimony by the undercover officer in buy-and-bust cases without explicitly addressing possible alternatives, such as the use of a screen or disguise. Where neither party proposes such measures, moreover, courts are obligated to raise and consider the possible use of such alternative devices on their own
 
 (see also, Pearson v James,
 
 105 F3d 828,
 
 supra; Okonkwo v Lacy,
 
 104 F3d 21,
 
 supra; United States v Peters,
 
 754 F2d 753, 761 [7th Cir 1985] [involving exclusion of media from voir dire proceedings, in violation of the First Amendment]). On rehearing in
 
 Ayala,
 
 the court emphasized the presumption of openness and that closure was to be no broader than necessary
 
 (see,
 
 102 F3d 649 [2d Cir Dec. 11, 1996],
 
 supra).
 

 We agree that these principles require trial courts, before excluding the public, to consider whether something short of
 
 *503
 
 complete closure would protect the "overriding interest” at stake. Indeed,
 
 Waller
 
 itself mandates that the trial court
 
 "must
 
 consider reasonable alternatives to closing the proceeding” (467 US at 48 [emphasis added]).
 
 Waller,
 
 however, does not hold that the trial court must explicitly consider alternatives on the record. Nor does it address who has the burden of suggesting possible alternatives. Rather,
 
 Waller
 
 merely requires factual findings "adequate to support the closure”
 
 (id.).
 

 Tellingly, in
 
 Waller
 
 itself the record patently lacked facts sufficient to justify closing the entire seven-day suppression hearing. Only a small portion of the hearing involved the sensitive information that the government — the proponent of closure — sought to shield from the public, and no link whatsoever was made between the government’s interest in confidentiality and the remainder of the proceeding. In light of this facial record deficiency, the trial court’s overly broad closure order could not be upheld without some explanation for its failure to limit closure to the sensitive portions of the proceeding.
 

 Likewise, in
 
 Press-Enterprise I,
 
 the proponent of closure (the government) failed to adduce adequate record facts to support the conclusion that the entire voir dire proceeding would involve sensitive juror questioning. The trial court nonetheless made no effort to limit closure to those portions of the proceeding comprising sensitive subject matter. And in
 
 Press-Enterprise II,
 
 as well, the Supreme Court indicated that it was concerned about the excessive breadth of the closure, noting that "closure of an entire 41-day proceeding would rarely be warranted” and that the trial court had failed to consider "alternatives short of complete closure” (478 US at 14, 15,
 
 supra).
 

 Thus, in
 
 Press-Enterprise I, Waller
 
 and
 
 Press-Enterprise II,
 
 the records lacked minimally sufficient facts to establish that the.portions of the proceedings subject to closure would even implicate the interests sought to be protected. Because only those parts of the proceedings that compromised the interests advanced could be closed, the need to restrict closure further was apparent from the record. The obligation to consider "alternatives” to accomplish this was inherent in the courts’ duty to ensure that closure be narrowly tailored.
 

 Importantly, these cases did not address application of the
 
 Waller
 
 test where the record makes no mention of alternatives but is otherwise sufficient to establish the need to close the particular proceeding
 
 (see also, Matter of Associated Press v
 
 
 *504
 

 Bell,
 
 70 NY2d 32, 39 [closure improper, where no findings that defendant’s rights would be prejudiced by publicity that closure would prevent or that reasonable alternatives could not adequately protect those rights, and such findings would not have had support in the record]). We conclude that, under the circumstances now presented, it can be implied that the trial court, in ordering closure, determined that no lesser alternative would protect the articulated interest
 
 (see, People v Bamberg,
 
 51 NY2d 868, 870 [trial court’s disposition of suppression motion may sufficiently imply its findings];
 
 People v Alfinito,
 
 16 NY2d 181, 186).
 

 Furthermore, the question as to who is responsible for enumerating desirable alternatives to closure was not before the
 
 Waller
 
 Court. Squarely faced with that question now, we conclude that, where the factual record permits closure and the closure is not facially overbroad, the party opposed to closing the proceeding must alert the court to any álternative procedures that allegedly would equally preserve the interest
 
 (see, Gannett Co. v DePasquale,
 
 443 US 368, 401 [Powell, J., concurring],
 
 supra
 
 ["members of the press and public who object to closure have the responsibility of showing to the court’s satisfaction that alternative procedures are available that would eliminate the dangers shown”]).
 

 This comports with our holding in
 
 Pearson,
 
 where we rejected the defendant’s argument that the trial court erred in failing to consider, on its own, certain alternatives to closing the courtroom during the undercover officer’s testimony, such as stationing a guard at the door to screen spectators, asking the defendant for particular family members he would like present or having the officer testify from behind a screen
 
 (see,
 
 82 NY2d at 444,
 
 supra).
 
 In
 
 Pearson,
 
 the facts sufficed to establish the requisite likelihood that the undercover officer’s safety — the interest advanced there to support closure — would be compromised by her testifying openly in the defendant’s case. The People’s closure application, moreover, was limited to that particular witness and, therefore, already narrowly tailored to the portion of the trial that would jeopardize the safety interest
 
 (compare, Waller v Georgia, 467
 
 US at 48,
 
 supra).
 

 We concluded that, "on the present record,” the court did not err in failing to explore alternatives to closure
 
 explicitly
 
 (82 NY2d at 444). There were "findings adequate to support the closure” during the entirety of the undercover witness’s testimony, as
 
 Waller
 
 requires (467 US at 48), and it could therefore be implied from the court’s granting the People’s mo
 
 *505
 
 tion that it considered excluding the public during that discrete part of the trial to be the least restrictive alternative that would ensure the officer’s safety. If, at that point, the defendant had alternative measures in mind that he wished the court to consider, he had "the responsibility of showing to the court’s satisfaction that [they] would eliminate the dangers shown”
 
 (Gannett Co. v DePasquale,
 
 443 US at 401,
 
 supra
 
 [Powell, J., concurring]).
 

 Any other rule would place an impractical — if not impossible — burden on trial courts, particularly in buy-and-bust cases. Even if the court were to hold a separate hearing on the issue, or itself consider and reject some alternatives to closing the proceeding, a defendant on appeal could likely always conjure up yet another method of concealing the witness’s identity that the court overlooked. Under these circumstances, placing the onus wholly on trial courts would provide an incentive for defendants to remain silent
 
 (see, Pearson v James,
 
 105 F3d at 832,
 
 supra
 
 [Jacobs and Cabranes, JJ., concurring]).
 

 This is especially true where, as in
 
 Pearson
 
 and buy-and-bust cases generally, the alternative measures suggested by defendants for the first time on appeal — a disguise, a partition, a guard stationed at the door to screen each prospective spectator — are potentially prejudicial to the defendant. Any device used to conceal the witness’s appearance threatens defendant’s confrontation rights and also suggests to the jury that the defendant (or the defendant’s family) is dangerous, while conducting a hearing with regard to each individual who seeks to enter the courtroom could become unduly disruptive. These procedures, therefore, might not be considered "reasonable” by the trial court or the particular defendant, and their imposition
 
 sua sponte
 
 could raise other fair trial concerns.
 

 In light of these considerations, we adhere to our holding in
 
 Pearson
 
 and conclude that the trial courts in the instant cases did not breach their duty to consider reasonable alternatives to closing the courtroom. Both records were sufficient to establish that any open-court testimony by the undercover officers would jeopardize their safety and effectiveness, and the closure did not extend beyond the live testimony of the witnesses at risk. Neither defendant, moreover, mentioned particular alternatives he was willing to adopt. To the contrary, when the court in
 
 Ramos
 
 suggested, on its own, alternative methods of concealing the witness’s identity, counsel voiced immediate concern. Finally, no mention was made of specific individuals the defendants wished to attend
 
 (see, People v Nieves,
 
 90 NY2d 426 [decided today]).
 

 
 *506
 
 Our holding today, however, by no means constitutes a green light for closing courtrooms in all buy-and-bust cases, and we condemn the allegedly routine practice of closing the courtroom during the testimony of undercover officers
 
 (see, Ayala v Speckard,
 
 102 F3d at 650, 651, n 1 [2d Cir Dec. 11, 1996],
 
 supra).
 
 This practice flies in the face of directives by the United States Supreme Court and this Court regarding courtroom closure.
 

 We therefore stress that defendants’ Sixth Amendment rights must not be lightly cast aside simply because the People claim that an undercover officer’s safety or effectiveness is at risk, and trial courts must vigilantly ensure that Waller’s demanding first prong is satisfied before closing a courtroom. Furthermore, because the undercover officer generally constitutes the primary witness against the defendant in buy-and-bust cases, we reiterate that it is "surely the better practice” for trial courts to explore the feasibility of possible alternatives to closing the courtroom with counsel on the record, even where it is not mandated
 
 (People v Martinez,
 
 82 NY2d at 444,
 
 supra).
 
 Indeed, we agree with the Second Circuit that some alternatives "appear to have been worth considering” and might in certain cases be appropriately substituted for closure
 
 (Pearson v James,
 
 105 F3d at 830,
 
 supra).
 

 Accordingly, in each case the order of the Appellate Division should be affirmed.
 

 Judges Titone, Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 In
 
 People v Ramos:
 
 On review of submissions pursuant to section 500.4 of the Rules of the Court of Appeals (22 NYCRR 500.4), order affirmed.
 

 In
 
 People v
 
 Ayala: Order affirmed.
 

 [1]
 

 . The People contend that a less demanding standard applies when the courtroom is partially closed and that, therefore, they needed to show only a "substantial reason” for the partial closure ordered during the testimony of officer number 27296 (see,
 
 e.g., Woods v Kuhlmann,
 
 977 F2d 74, 76 [2d Cir 1992];
 
 Douglas v Wainwright,
 
 739 F2d 531 [11th Cir 1984],
 
 cert denied
 
 469 US 1208). We need not address this argument, in light of our conclusion that
 
 Waller’s
 
 more stringent requirement of an "overriding interest” was met.
 

 [2]
 

 . Although the Second Circuit has followed
 
 Ayala
 
 in
 
 Pearson v James
 
 (105 F3d 828, supra) and
 
 Okonkwo v Lacy
 
 (104 F3d 21), members of the three-judge panel in
 
 Pearson
 
 expressed their disagreement with the
 
 Ayala
 
 court’s conclusion regarding reasonable alternatives
 
 (see, Pearson v James, 105
 
 F3d at 831-832 [Jacobs and Cabranes, JJ., concurring]). The Second Circuit has, moreover, granted rehearing en banc in
 
 Ayala, Pearson
 
 and
 
 Okonkwo
 
 (Nos. 95-2463, 95-2626, 95-2672, 95-2801 [2d Cir May 19, 1997]).
 

 [3]
 

 . Unlike the Sixth Amendment guarantee of a public trial, which is for the benefit of the defendant (see,
 
 Gannett Co. v DePasquale,
 
 443 US 368), the First Amendment confers an enforceable right of access to criminal trials upon the press and general public (see,
 
 Richmond Newspapers v Virginia,
 
 448 US 555).