OPINION OF THE COURT
 

 Wesley, J.
 

 “Buy-and-bust” cases often involve the testimony of an undercover officer. When the People can establish an overrid
 
 *215
 
 ing interest that open-court testimony by an undercover officer would jeopardize the officer’s safety, the Trial Judge may close the courtroom during the testimony of that witness. For the reasons that follow, we conclude that the posting of a court officer outside the courtroom as a screening device under the circumstances of this case amounts to an “alternative to closure” that implicated defendant’s Sixth Amendment right to a public trial. Because the “overriding interest” test of
 
 Waller v Georgia
 
 (467 US 39) was satisfied, the order of the Appellate Division should be affirmed
 
 (see, People v Ramos,
 
 90 NY2d 490, 497-499,
 
 cert denied
 
 522 US 1002).
 

 Based on the allegations of undercover officer number 1625, defendant Michael Jones and codefendant Derrick Hudson were arrested on June 1, 1996, and charged with sale and possession of crack-cocaine in Brooklyn. At trial, the People moved to close the courtroom during the undercover’s testimony. The court conducted a hearing pursuant to
 
 People v Hinton
 
 (31 NY2d 71,
 
 cert denied
 
 410 US 911) to determine the propriety of closure. The undercover testified that she had worked as an undercover officer for “[a] little less than three years,” had made “[a]bout 250” drug purchases during that period, and had testified nine times at trial. At various times during those three years, she had worked as an undercover officer in Brooklyn. Approximately one month before defendant’s trial, however, she had been transferred to Manhattan, and was working undercover for the “North Manhattan Initiative” at the time of the trial. The undercover stated that although she no longer worked in Brooklyn the possibility remained that she would at some point return there to operate as an undercover. She indicated that in her ongoing cases before the Brooklyn Grand Jury, she took precautions — such as not mingling with the general public, dressing in civilian garb, not traveling in a police vehicle and using a separate entrance to enter the courtroom — to protect her undercover status. The undercover also testified that she had about 10 “lost subjects” in Brooklyn who had not yet been arrested and that she had received threats in the past.
 

 Following the
 
 Hinton
 
 hearing, the prosecution argued that it was not asking for the courtroom to be sealed. However, because a “probability” existed that the undercover officer would be sent back to Brooklyn and because codefendant Derrick Hudson was at large and subject to a bench warrant, the
 
 *216
 
 prosecution requested that, during the undercover’s testimony, the court post a court officer outside the courtroom to question anyone who might pose a threat to her. Defense counsel objected, arguing there was no danger in having the undercover officer testify in open court as she no longer worked in Brooklyn.
 

 The court determined that the closure request was premised on an overriding interest because the codefendant was still at large and had been bench warranted. The court concluded, however, that because the undercover would not be returning to the Brooklyn area, complete closure of the courtroom during her testimony was not warranted. The court decided to post a court officer outside the courtroom door during the undercover’s testimony and to allow admission of attorneys and all family members of defendant. The court officer was asked to interview all other people seeking entry to the courtroom and instructed to ask attendees their identity and their interest in coming to court. The court further stated that, if necessary, it would recess proceedings to determine whether an individual should be admitted.
 

 After the undercover testified, the prosecutor noted on the record, without objection from defense counsel, that only three individuals were present in the courtroom during the course of the undercover’s testimony — an attorney from defense counsel’s office, another prosecutor from the District Attorney’s office, and a member of defendant’s family. The prosecution also noted that the court officer stationed outside the courtroom had reported that “at no time did anyone else seek to enter the courtroom and everyone who sought entrance was permitted in.” Defendant was convicted of criminal sale of a controlled substance in the third degree.
 

 The Appellate Division rejected defendant’s contention that the posting of a court officer outside the courtroom to screen potential spectators abridged his Sixth Amendment right to a public trial (266 AD2d 476). We now affirm.
 

 Although a criminal defendant has a right to a public trial
 
 (see,
 
 US Const, 6th Amend), that right is not absolute
 
 (see, People v Ramos,
 
 90 NY2d 490, 497,
 
 supra).
 
 Trial courts have the discretion to exclude the public, although they must exercise that discretion “ ‘sparingly * * * and then, only when unusual circumstances necessitate it’ ”
 
 (People v Martinez,
 
 82 NY2d 436, 441 [quoting
 
 People v Hinton,
 
 31 NY2d 71, 76,
 
 supra]).
 
 “Closure remains only an exception to the mandatory
 
 *217
 
 postulate of open trials”
 
 (People v Kin Kan,
 
 78 NY2d 54, 57,
 
 rearg denied
 
 78 NY2d 1008;
 
 see also, Press-Enterprise Co. v Superior Ct.,
 
 464 US 501, 509 [“Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness”];
 
 Globe Newspaper Co. v Superior Ct.,
 
 457 US 596, 606 [“the State’s justification in denying access must be a weighty one”];
 
 Richmond Newspapers v Virginia,
 
 448 US 555, 581 [“Absent an overriding interest * * * the trial of a criminal case must be open to the public”]).
 

 The determination whether the right to an open trial will give way to other rights or interests requires a careful balancing of those concerns
 
 (Waller v Georgia,
 
 467 US 39, 45, supra;
 
 see also, People v Nieves,
 
 90 NY2d 426, 429;
 
 People v Kin Kan, supra,
 
 78 NY2d, at 57). To assist courts in striking this balance, the United States Supreme Court has established a four-part standard the closure order must satisfy to survive Sixth Amendment scrutiny:
 

 “[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure”
 
 (Waller, supra,
 
 467 US, at 48).
 

 The proponent of closure must first assert that a substantial probability of prejudice to a compelling interest will result from an open proceeding
 
 (Press-Enterprise Co. v Superior Ct.,
 
 478 US 1, 14;
 
 see also, People v Ramos, supra,
 
 90 NY2d, at 498). Thus, a nexus between the particular overriding interest asserted and open-court testimony must be established in any given case
 
 (People v Ramos, supra,
 
 90 NY2d, at 498). A defendant’s Sixth Amendment rights “must not be lightly cast aside simply because the People claim that an undercover officer’s safety or effectiveness is at risk” and we have stressed that trial courts must “vigilantly ensure that
 
 Waller’s
 
 demanding first prong is satisfied before closing a courtroom”
 
 (id.,
 
 at 506). When closure is sought for the safety of undercover law enforcement officers, we have held that “the
 
 mere possibility
 
 that this safety interest
 
 might
 
 be compromised by open-court testimony does not justify abridgement of a defendant’s constitutional right to a public trial”
 
 (id.,
 
 at 498 [emphasis added];
 
 see also, People v Martinez, supra,
 
 82 NY2d, at 443).
 

 
 *218
 
 In the case at hand, the prosecution asked the court to post a court officer outside the courtroom to monitor those entering and exiting the courtroom. Defendant contends that the use of the screening mechanism employed here is tantamount to total closure of the courtroom. Total closure of a courtroom excludes all persons (other than court personnel, the witness, defendant and trial counsel) from the courtroom
 
 (see, Waller, supra,
 
 467 US, at 42;
 
 see also, Press-Enterprise Co. v Superior Ct.,
 
 478 US 1,
 
 supra
 
 [exclusion of the public from 41-day preliminary hearing];
 
 Press-Enterprise Co. v Superior Ct.,
 
 464 US 501,
 
 supra
 
 [exclusion of the public from six-weeks of voir dire proceedings]). A screening and identification procedure, by contrast, bars only those who do not submit to the identification or those who are “chilled” by the procedure itself
 
 (United States v DeLuca,
 
 137 F3d 24, 33-34 [1st Cir],
 
 cert denied
 
 525 US 874;
 
 see also, United States v Brazel,
 
 102 F3d 1120, 1155 [11th Cir],
 
 cert denied
 
 522 US 822).
 

 The trial court’s order did not exclude all members of the general public
 
 (cf., People v Tolentino,
 
 90 NY2d 867;
 
 People v Ramos,
 
 90 NY2d 490,
 
 supra; People v Martinez,
 
 82 NY2d 436,
 
 supra),
 
 nor did it exclude any specific person
 
 (cf., People v Nieves,
 
 90 NY2d 426,
 
 supra; People v Kin Kan,
 
 78 NY2d 54,
 
 supra).
 
 Rather, the court reserved the right to exclude based on its own evaluation of the explanation offered by any individual seeking admission during only the undercover officer’s testimony.
 
 [1]
 

 Some courts have considered such a screening mechanism to be “an alternative to closure”
 
 (see, e.g., People v Smalls,
 
 275 AD2d 645,
 
 lv denied
 
 95 NY2d 969;
 
 People v Carillo,
 
 267 AD2d 43;
 
 People v Witt,
 
 258 AD2d 300,
 
 lv denied
 
 93 NY2d 1029;
 
 People v Torres,
 
 257 AD2d 639,
 
 lv denied
 
 93 NY2d 858;
 
 People v Perez,
 
 245 AD2d 71,
 
 lv denied
 
 91 NY2d 976;
 
 People v Brown,
 
 243 AD2d 641,
 
 lv denied
 
 91 NY2d 924;
 
 see also, People v
 
 
 *219
 

 Martinez, supra,
 
 82 NY2d, at 444). Others have referred to the screening procedure as a “partial” closure
 
 (see, United States v DeLuca, supra,
 
 137 F3d, at 33;
 
 United States v Brazel, supra,
 
 102 F3d, at 1155;
 
 Woods v Kuhlmann,
 
 977 F2d 74, 76 [2d Cir]). Whatever we call it, the device implemented here raises the same secrecy and fairness concerns that a total closure does
 
 (contra, Woods v Kuhlmann, supra,
 
 977 F2d, at 76). The defendant’s Sixth Amendment right to a public trial is still implicated
 
 (see, id.).
 
 However, the question remains whether the People must establish an “overriding interest” when a court is asked to order a limited and conditional restriction on access to the courtroom? Because the Sixth Amendment is implicated by the procedure sought, the People must still meet the “overriding interest” requirement of
 
 Waller.
 

 We are aware that some courts have recognized that a less demanding standard can be applied to limited closure requests
 
 (see, e.g., Woods v Kuhlmann, supra,
 
 977 F2d, at 76 [“when a trial judge orders a partial, as opposed to a total, closure of a court proceeding at the request of one party, a ‘substantial reason’ rather than
 
 Waller’s
 
 ‘overriding interest’ will justify the closure”];
 
 see also, United States v Osborne,
 
 68 F3d 94, 98-99 [5th Cir];
 
 United States v Sherlock,
 
 962 F2d 1349, 1357 [9th Cir],
 
 cert denied sub nom. Charley v United States
 
 506 US 958;
 
 Douglas v Wainwright,
 
 739 F2d 531, 533 [11th Cir],
 
 cert denied
 
 469 US 1208).
 
 [2]
 
 We disagree.
 

 We believe that there is no need to adopt such an articulation of the
 
 Waller
 
 standard since
 
 Waller
 
 already contemplates a balancing of competing interests in closure decisions.
 
 When
 
 the procedure requested impacts on a defendant’s right to a public trial, nothing less than an overriding interest can satisfy constitutional scrutiny
 
 (see, Waller v Georgia, supra,
 
 467 US, at 48). As the United States Supreme Court has recognized, “[t]he presumption of
 
 openness
 
 may be overcome
 
 only by an overriding interest
 
 based on findings that closure is essential to preserve
 
 higher
 
 values and is narrowly tailored to serve that interest”
 
 (Press-Enterprise Co. v Superior Ct.,
 
 464 US 501, 510,
 
 supra
 
 [emphasis added]).
 

 
 *220
 
 The proponent of closure must still establish that there is a “substantial probability” that the overriding interest asserted will be prejudiced as a result of an open proceeding
 
 (People v Ramos,
 
 90 NY2d 490, 498-499,
 
 supra).
 
 Trial courts are called upon to ensure that the closure is no broader than necessary and to consider alternatives to closure suggested by the parties. The breadth of the closure request therefore will always be measured against the risk of prejudice to the asserted overriding interest. The risk of prejudice to a compelling interest such as the safety of an undercover officer depends upon the facts of each case. For example, in
 
 Ramos
 
 and
 
 Martinez
 
 the proof concerning the risks of prejudice to the undercover officers’ open court testimony required different, yet appropriate, closure results
 
 (compare, People v Ramos,
 
 90 NY2d 490,
 
 supra, with People v Martinez,
 
 82 NY2d 436,
 
 supra).
 
 This part of the balancing test embraces consideration of measures less than complete closure while preserving the defendant’s right to an open trial.
 

 Here, the People met their burden. The codefendant was at large and a bench warrant had been issued for his arrest. In addition, while the undercover testified that she no longer worked in Brooklyn, she still had occasion to return there to testify before the Grand Jury and there were still 10 “lost subjects” who had yet to be arrested
 
 (see, People v Diaz,
 
 237 AD2d 457,
 
 lv denied
 
 90 NY2d 892;
 
 see also, People v Ramos, supra,
 
 90 NY2d, at 499). The undercover also testified as to threats she had received, although none were particularly related to the instant case
 
 (see, People v Martinez, supra,
 
 82 NY2d, at 443). Furthermore, the People’s application was limited in scope and was narrowly tailored to that portion of the trial that might jeopardize the undercover’s safety
 
 (People v Ramos, supra,
 
 90 NY2d, at 504). As a final matter, we note that when the alternative to closure was sought by the prosecution, at no time did defendant argue that there was a less restrictive alternative to posting a guard outside the courtroom. Certainly, “[i]f, at that point, the defendant had alternative measures in mind that he wished the court to consider, he had ‘the responsibility of showing to the court’s satisfaction that [they] would eliminate the dangers shown’ ”
 
 (id.,
 
 at 505 [citation omitted]). Thus, all four
 
 Waller
 
 prongs have been satisfied and the restriction on the public’s access to the courtroom in this case did not constitute a violation of defendant’s right to a public trial.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 
 *221
 
 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Rosenblatt and Graffeo concur.
 

 Order affirmed.
 

 [1]
 

 . The procedure used by the trial court is distinguishable from one in which there is no restriction on access, such as the practice of locking courtroom doors during a jury charge
 
 (see, People v Colon,
 
 71 NY2d 410,
 
 cert denied
 
 487 US 1239). Locking courtroom doors to avoid disruption while allowing those already present to remain does not “exclude the public or frustrate the salutary purposes of public scrutiny”
 
 (id.,
 
 at 416). “All members of the public or press who wanted to observe the jury charge were permitted to do so if there was enough space in the courtroom and they arrived in time”
 
 (Herring v Meachum,
 
 11 F3d 374, 380 [2d Cir],
 
 cert denied
 
 511 US 1059). “[T]he Sixth Amendment protects the right to a public trial; it does not guarantee that trials will be conducted to fit the schedules of all who wish to attend”
 
 (id.).
 

 [2]
 

 . We note that the upshot of this type of closure analysis is that there is often not a meaningful distinction between the first and second prongs of the
 
 Waller
 
 test. As one court has opined, “[i]ndeed, in many cases there will be an appropriately proportional relationship between the scope of a closure and the risk that justifies the closure
 
 precisely because
 
 the closure is as narrowly tailored as reasonably possible”
 
 (Bowden v Keane,
 
 237 F3d 125, 130, n 2 [2d Cir] [emphasis in original]).